IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:13-CV-200-FL

| | | |
|---|---|---|
| CAPE FEAR RIVER WATCH, INC.; SIERRA CLUB; and WATERKEEPER ALLIANCE, | ) ) ) ) | |
| Plaintiffs, | ) ) | ORDER |
| v. | ) ) ) | |
| DUKE ENERGY PROGRESS, INC., | ) ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion to dismiss for failure to state a claim and for lack of subject matter jurisdiction (DE 15), to which plaintiffs have responded and defendant replied.[1] These issues are now ripe for review. For the following reasons, defendant's motion is granted in part and denied in part.

---

[1] Also pending before the court are plaintiffs' two motions for permission to inform the court concerning developments regarding a criminal investigation and other litigation (DE 28, 32) to which the court responded in order entered March 5, 2014, inviting the parties to consider utility of a case stay and/or to promote any additional briefing schedule which may be useful related to events ongoing where plaintiffs were directed to cease filing motions describing events daily unfolding because a more formal process of presentation and response was deemed necessary. Ultimately, a stay was not determined appropriate and on March 20, 2014, the court put in place the formal briefing schedule. As such, DE 28 and 32, to which no separate responses have been made, are deemed moot and the court refers instead for the sides' respective views concerning impact, if any, of ongoing matters to the supplemental briefs (DE 39, 40) subsequently filed in accordance with the court's March 20, 2013, order, as noted herein. Accordingly, the clerk is directed to terminate those permission motions at DE 28 and 32. However, to the extent any attachments or exhibits thereto were referenced in the parties' supplemental briefs or their original briefs, those documents are considered.

## STATEMENT OF THE CASE

Cape Fear River Watch, Inc., Sierra Club, and Waterkeeper Alliance ("plaintiffs") initiated this matter on September 12, 2013,[2] by filing complaint against defendant pursuant to the Clean Water Act, 33 U.S.C. §§ 1251-1376 ("CWA" or "the Act") citizens' suit provision, alleging violations through unauthorized surface discharges into Sutton Lake in North Carolina (Count I), entering of removed substances into state waters and navigable waters of the United States (Count II), and discharges through close hydrologic flow into Sutton Lake (Count III). Plaintiffs seek declaratory and injunctive relief as well as civil penalties and costs. Defendant moved to dismiss in lieu of answering the complaint on November 5, 2013, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs responded in opposition on December 17, 2013, and defendant replied on January 17, 2014.

Although the motion to dismiss was submitted for consideration on January 21, 2014, plaintiffs filed two motions for permission to inform the court concerning developments regarding criminal investigation into the Sutton Site[3] and litigation on February 25, 2014, and March 5, 2014. In order to encourage a more formal process of presentation of such additional materials, the court ordered the parties to consider a stay of the case and/or additional briefing on the motion to dismiss on March 5, 2014. The court also tolled defendant's response time to plaintiff's motions. After the parties responded, the court further ordered on March 20, 2014, that a temporary stay was not

---

[2] Before plaintiffs filed suit they gave defendant, the Administrator of the United States Environmental Protection Agency ("EPA"), and North Carolina Department of Environmental and Natural Resources ("DENR") notice of the violations specified in the complaint and of plaintiffs' intent to file suit after sixty (60) days should those violations continue, pursuant to 33 U.S.C. § 1365(b)(1)(A), and 40 C.F.R. § 135.2.

[3] The Sutton Site is defendant's electricity-generating facility located north of Wilmington off Highway 421 in New Hanover County, North Carolina.

2

appropriate, and provided that supplemental briefing would be conducted on the motion to dismiss. On April 3, 2014, plaintiffs submitted a supplemental brief, and on April 17, 2014, defendant submitted a supplemental brief, both in accordance with the court's order. The motion to dismiss was again submitted for consideration on April 18, 2014.

## STATEMENT OF FACTS[4]

A.      Allegations in the Complaint

    1.      Development of the Sutton Facility

Plaintiffs are conservation groups whose members recreate, fish and operate charter fishing businesses on Sutton Lake, and who have had their use enjoyment of Sutton Lake reduced by defendant's discharges. Defendant is engaged in the generation, transmission, distribution and sale of electricity. It is a North Carolina corporation headquartered in Raleigh. Defendant's L.V. Sutton Steam Electric Plant coal-fired electricity generating plant ("Sutton") is located north of Wilmington, and adjacent to Sutton Lake and the Cape Fear River. Defendant owns and operates Sutton.

In 1971, North Carolina authorized, through statute and easement, defendant's predecessor to dam Catfish Creek, a navigable stream, in order to create the 1,100-acre Sutton Lake. Since then, the lake has been managed by the North Carolina Wildlife Resources Commission ("WRC") as a public fishery. Sutton Lake is a popular fishing destination, frequented by sport and subsistence fishermen for consumption. WRC manages the Sutton Lake fishery with financial support from federal funds and grants from the U.S. Fish and Wildlife Service's Sport Fish Restoration Program.

---

[4] As explained below, the facts alleged in the complaint are taken as true for the purposes of evaluating the adequacy of the complaint under Rule 12(b)(6). However, additional facts outside of the pleadings may be considered by the court to determine if the case should be dismissed for lack of jurisdiction without converting the motion to dismiss into one for summary judgment.

3

These entities encourage the public to fish at the Lake and recently renovated its boat ramps and fishing pier to provide greater public access. North Carolina Department of Justice, in correspondence attached to the complaint, suggested that Sutton Lake is a water of the state, as defined under North Carolina law.[5]

Pursuant to its delegated authority under the CWA, 33 U.S.C. § 1342(b), DENR issued National Pollutant Discharge Elimination System ("NPDES") permit #NC0001422, effective January 1, 2012, (the "Sutton NPDES permit"). The Sutton NPDES permit authorizes only one point source discharge into the Cape Fear River from the Sutton Site. Defendant does not have a NPDES permit for discharges into Sutton Lake.

The Sutton facility includes two coal ash settling lagoons, known as the Old Ash Pond Area (approximately 54 acres, constructed in 1972) and New Ash Pond (approximately 82 acres, constructed in 1984), which border Sutton Lake and discharge into it. The lagoons contain coal ash stored in a wet state. Neither of the lagoons has a synthetic liner. A sinkhole opened beneath one of the berms of the New Ash Pond in 2000, and there was a partial collapse and spill from another of the New Ash Pond berms in 2010. EPA noted that some of the Old Ash Pond berms may be constructed on a foundation of coal ash, as was the case with a 2008 Kingston, Tennessee, coal ash spill. The berms of both Sutton coal ash lagoons have been given a "Significant" Hazard rating by EPA based on the potential for economic and environmental losses due to a spill.

---

[5] Waters of the State are defined as "any stream, river, brook, swamp, lake, sound, tidal estuary, bay, creek, reservoir, waterway, or other body or accumulation of water, whether surface or underground, public or private, or natural or artificial, that is contained in, flows through, or borders upon any portion of this state . . . ." N.C. Gen. Stat. 143-212(6).

2.       Discharges and Contamination

Defendant has dumped and is dumping polluted water from its coal ash lagoons directly into Sutton Lake and its public fishery.  These discharges include coal ash sluice water, coal pile runoff, chemical metal cleaning wastes, and other wastewater.  As a result, Sutton Lake has become heavily contaminated with toxic pollutants including arsenic, selenium, mercury, antimony, cadmium, chromium, lead and zinc;  and other pollutants including sulfate, copper, ammonia, nitrogen, phosphorus, iron, manganese, total dissolved solids, and total suspended solids.

Taking selenium as an example, decades of sampling reveal that concentrations in Sutton Lake have increased dramatically over time, such that in recent years the selenium concentrations in the surface water reached levels that cause reproductive failure of fish and waterfowl and have far exceeded those levels in the lake sediments and in fish tissue itself.  WRC determined that the sediment and fish tissue concentrations of selenium represent a "High" hazard for reproductive failure of fish and waterfowl.  WRC staff commented that defendant has been withholding selenium data from WRC, despite multiple requests for updated concentration information.  Once selenium levels reach a certain point, the fishery could be killed off entirely.  Selenium is also bioaccumulative, meaning it is passed up the food chain in increasing concentrations, and excessive amounts have been found in water snakes, small mammals, birds and humans.

As summarized by the parties, the Sutton NPDES permit treats discharges from the waste streams of the coal ash lagoons into Sutton Lake as "internal outfalls" within a waste treatment system.[6]  These discharges are termed "internal" in the permit because they are considered not to

---

[6] Attached to the complaint is a document that appears to be a modified version of a permit for Sutton, but its permit number does not match that alleged in the complaint (DE 1-8).  The parties do not dispute the content of the Sutton NPDES permit.

discharge to waters of the United States. Accordingly, the Sutton NPDES permit contains no limits on the discharges to Sutton Lake for toxic pollutants such as selenium and arsenic. Thus, the permit does not protect water quality in Sutton Lake.

In addition, defendant has allowed pollutants and coal ash materials to escape from its coal ash lagoons into the groundwater at Sutton. These discharges are prohibited by the Sutton NPDES permit. The resulting plume of contaminated groundwater is migrating towards drinking water supply wells that provide drinking water to the community around Flemington Road. These Flemington wells are located approximately half a mile from the Sutton coal ash lagoons. As described in the complaint, a recent "Source Water Assessment Program Report" prepared by the North Carolina Division of Environmental Health, Public Water Supply Section, for the water system served by the Flemington wells assigned them an "Inherent Vulnerability Rating," "Contaminant Rating," and "Susceptibility Rating" the highest risk ratings, and the report listed the Sutton facility numerous times as a "Potential Contaminant Source" for these wells. The report also confirms that many of the highly contaminated groundwater wells at Sutton are within the area that contributes groundwater to the Flemington wells.

The contaminated groundwater at Sutton is also flowing directly into a canal that is connected to and flows into Sutton Lake. As a result, the coal ash lagoons are discharging pollutants into Sutton Lake via this hydrologic connection. Defendant had plans to retire its coal-fired generating operation at Sutton by the end of 2013, but had not submitted a closure plan for the ash lagoons to DENR and planned to leave the ash in place and continue using the ash lagoons to receive waste streams and discharge into Sutton Lake. As long as the coal ash remains in these leaking

6

lagoons, it will continue to discharge pollutants into Sutton Lake and place the public fishery at risk

of a coal ash spill into the Lake.

B.        Recent Developments at Coal Ash Facilities Statewide

Before plaintiffs filed complaint in this court, DENR sued defendant in state court, on

August 16, 2013, alleging violations of state environmental laws at Sutton and five other facilities

in North Carolina.  State of North Carolina v. Duke Energy Progress, Inc., C.A. No. 13-CVS-11032,

Aug. 16, 2013, (Wake Co.).  DENR notes in its complaint that groundwater sampling is required,

and groundwater standards, at or beyond the "Compliance Boundary" are alleged to be violated

pursuant to state law.  Thus, the claims in DENR's complaint before Wake County Superior Court

are different from the claims brought by plaintiffs in this case.

On February 10, 2014, the United States Attorney's Office in the Eastern District of North

Carolina issued a subpoena to DENR requiring testimony before the court's grand jury regarding

defendant's Dan River facility, which discharges coal ash and wastewater to the Dan River and

recently had a catastrophic spill[7] onsite.  (DE 30-1).  Defendant was also subpoenaed on that date.

On February 11, 2014, eighteen DENR employees were subpoenaed concerning payments or other

things of value they may have received from defendant or its related companies, and DENR was

subpoenaed again for personnel records of twenty current and former employees.  (DE 30-2).

Notably, Sergei Chernikov is one of the employees subpoenaed and also the DENR contact person

for the Fact Sheet on the Sutton NPDES Permit.  (DE 33-3).

---

[7] On February 2, 2014, a stormwater pipe burst beneath the coal ash impoundment at defendant's retired Dan River Power Station near Eden, North Carolina.  The coal ash flowed into the river for days, and leaked tens of thousands of tons of coal ash and tens of millions of gallons of contaminated water, which polluted the river for at least 70 miles through North Carolina and Virginia.

On February 18, 2014, DENR was subpoenaed for documents and information relating to fourteen facilities owned by defendant, including Sutton. (DE 30-3). The February 18, 2014, subpoena specifically seeks documents related to the activities of defendant and DENR and their handling of the state court enforcement proceedings that includes the Sutton facility. Id. at 5, ¶16 (requesting "[a]ll documents, recordings, public records or other evidence relating to communications between Duke Energy and NC DENR regarding the enforcement actions brought by NC DENR in the following cases: *State of North Carolina v. Duke Energy Carolinas, LLC,* Case No. 13 CVS 14611; *State of North Carolina v. Duke Energy Progress, Inc.,* Case No. 13 CVS 11 032; *State of North Carolina v. Carolina Power & Light Company d/b/a Progress Energy Carolinas, Inc.,* Case No. 2013 CVS 4061; and *State of North Carolina v. Duke Energy Carolinas,* Case No. 13 CVS 9352. Records sought include any pre-filing correspondence with Duke Energy and/or its subsidiaries as well as all drafts of proposed settlement agreements and all documents and correspondence relating to the decision to revoke the proposed settlement in *State of North Carolina v. Duke Energy Carolinas,* Case No. 13 CVS 9352").

On February 20, 2014, DENR indicated that it was assembling a task force in response to the Dan River ash spill, which would revisit the terms of a then-proposed consent order regarding that site in state superior court. (DE 37-5). The consent order was subsequently withdrawn in that case. (DE 40-6).

On February 28, 2014, DENR issued a Notice of Violation to Duke Energy-Dan River Steam Station for its violations at the Dan River facility. (DE 33-1). In that notice, DENR cites the discharge of coal ash pollutants from the ash pond at the Dan River facility into waters of the state, and as a result claims a violation of the Removed Substances Permit Provision of that NPDES

permit. The Removed Substances Provision for the Dan River facility's permit is one of the standard conditions that is also contained in the Sutton NPDES permit.

On March 12, 2014, defendant responded to an inquiry from Governor Pat McCrory regarding its recommendations for actions concerning coal ash basins in North Carolina. (DE 37-2). DENR found this response to be inadequate, and on March 13, 2014, DENR issued two press releases. First, DENR indicated that it plans to modify permits at three facilities, including Sutton. (DE 39-1). Second, DENR claimed that defendant's response to an information request on coal ash facilities was inadequate, specifically listing Sutton as high-priority. (DE 39-3). On March 14, 2014, DENR sent defendant a notice of modification regarding the Sutton NPDES permit. (DE 40-3). That same day, DENR invited EPA to "partner with DENR in the responsible resolution of not only the Dan River matter, but other environmental issues at the thirteen additional Duke Energy sites in North Carolina." (DE 40-4). On March 17, 2014, EPA responded that such a joint approach was "a desirable way to proceed for both of our agencies," and also suggested "crafting an over-all solution to outstanding CWA concerns at Duke Energy facilities." (DE 40-5).

## COURT'S DISCUSSION

A.      Standard of Review

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is to eliminate claims that are factually or legally insufficient. Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is stated if the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as

9

true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (internal citations omitted).

A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction, and the plaintiff bears the burden of showing that federal jurisdiction is appropriate when challenged by the defendant. See McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Such a motion may attack the existence of subject matter jurisdiction in fact, apart from the complaint. Adams, 697 F.2d at 1219. In that instance, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Richmond, F. & P. R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). The standard of review, however, is the same as with a motion for summary judgment. Thus, "the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (internal citations omitted).

B.      Analysis

1.              Jurisdictional Waters of the United States

Congress passed the CWA in 1972, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into "navigable waters" except as in compliance with the Act's provisions. See 33 U.S.C.

§ 1311(a) (prohibiting the discharge of any pollutant); § 1362(12)(A) (defining "discharge of a pollutant" as the addition of a pollutant into navigable waters).

The Act defines "navigable waters" as "waters of the United States, including the territorial seas." § 1362(7). The jurisdiction of the CWA is limited to the waters of the United States. Whether a particular waterbody is jurisdictional as a water of the United States is a key threshold question for determining whether a discharge into that water will require a permit under the CWA.

Regulations of the EPA and the United States Army Corps of Engineers ("Corps of Engineers" or "Corps") provide that waters of the United States include "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, . . . [a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), . . . the use, degradation, or destruction of which could affect interstate or foreign commerce, [and] [a]ll impoundments of waters otherwise defined as waters of the United States. . . . [W]aste treatment systems, including treatment ponds or lagoons designed to meet the requirements of the CWA (other than cooling ponds . . .) are not waters of the United States." 33 C.F.R. § 328.3(a); 40 C.F.R. § 230.3(s).

Thus, jurisdiction exists only where pollutants are discharged into a "water of the United States." The term "waters of the United States" encompasses more than traditionally navigable waters. Indeed, the term is defined by the Corps of Engineers' regulations to include not only actually navigable waters but also tributaries of such waters as well as adjacent wetlands. See 33

CFR § 328.3(a).[8]   The regulations specify that "adjacent" means "bordering, contiguous, or neighboring," and that wetlands are "adjacent" even if separated from other waters by man-made dikes or barriers, natural river berms, beach dunes and the like. § 328.3(c).

### a.  Supreme Court

The parameters of jurisdiction under the Act has been examined in three major Supreme Court cases.   In Rapanos v. United States, 547 U.S. 715 (2006), the Supreme Court examined its earlier interpretations of the term "navigable waters" in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121 (1985), and Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers, 531 U.S. 159 (2001) ("SWANCC"), to determine whether wetlands "adjacent" to traditional navigable waters fall within the federal regulatory authority of the CWA.

### i.  Pre-Rapanos Decisions

The Supreme Court first interpreted the phrase "waters of the United States" in Riverside Bayview Homes.  474 U.S. 121.  That case involved a wetland that extended beyond the boundary

---

[8] "Waters of the United States" is defined fully to include:
>    (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
>    (2) All interstate waters including interstate wetlands;
>    (3) All other waters such as intrastate lakes, streams (including intermittent streams)... wetlands ... or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:
>        (I) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or
>        (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
>        (iii) Which are used or could be used for industrial purpose by industries in interstate commerce;
>    (4) All impoundments of waters otherwise defined as waters of the United States;
>    (5) Tributaries of waters identified in paragraphs (1) through (4);
>    (6) The territorial seas;
>    (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (1) through (6).
> 33 CFR § 328.3(a).

of the respondent's property to a navigable waterway.  Id. at 131.  Noting that "the transition from water to solid ground is not necessarily or even typically an abrupt one," and that there is necessarily some difficulty in determining where the water ends and the land begins, the Court upheld the Corps of Engineers' interpretation of "waters of the United States" to include wetlands that "actually abut on" traditional navigable waters.  Id. at 135.

Following the Court's decision in Riverside Bayview, the Corps of Engineers adopted increasingly broad interpretations of its regulations.  In SWANCC, the Court examined the Corps' so-called "Migratory Bird Rule," which purported to extend jurisdiction under the Act to any intrastate waters "which are or could be used as a habitat" by migratory birds.  531 U.S. at 163-64.  In that case, the Corps applied the Migratory Bird Rule to regulate an abandoned sand and gravel pit in northern Illinois.  Id. at 162.  The Court determined that the Corps had gone too far, observing that "it was the *significant nexus* between the wetlands and 'navigable waters' that informed our reading of the CWA in Riverside Bayview."  Id. at 167.  The Court held that non-navigable, isolated, intrastate waters which did not actually abut on a navigable waterway were not included as "waters of the United States."  Id.

### ii.    Rapanos v. United States

In Rapanos, 547 U.S. 715, which involved two consolidated cases, the Supreme Court delivered its most recent interpretation of "waters of the United States," this time in the context of adjacent wetlands.  The cases involved four separate wetlands, all near ditches or man-made drains that eventually emptied into traditional navigable waters.  In both cases, the Sixth Circuit concluded that the wetlands were covered by the CWA.  Id. at 729-30.  The Supreme Court consolidated the cases and granted *certiorar*i to decide whether the wetlands actually constituted "waters of the

United States" under the CWA. The Supreme Court vacated the Sixth Circuit and remanded the cases for reconsideration in light of the appropriate legal standard. Id. at 757.

The Court itself, however, could not agree on the appropriate legal standard, and issued a split decision. Although there are five written opinions which make up the Rapanos decision, the three major opinions are: (1) the plurality opinion authored by Justice Scalia and joined by Chief Justice Roberts together with Justices Thomas, and Alito; (2) Justice Kennedy's concurring opinion; and (3) the dissenting opinion authored by Justice Stevens and joined by Justices Souter, Ginsburg, and Breyer.

Justice Scalia, in writing for the plurality, advocated a newly restrictive approach to jurisdictional determinations under the CWA. Under this approach:

> The phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams, oceans, rivers, and lakes." The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.

Id. at 739 (internal citations omitted). The plurality explained, however, that "[b]y describing 'waters' as 'relatively permanent,' we do not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought. We also do not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." Id. at 733, n. 5.

Further, the plurality addressed the circumstances under which a wetland may be considered "adjacent to" waters of the United States, concluding that:

[O]nly those wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between "waters" and wetlands, are "adjacent to" such waters and covered by the [CWA]. Wetlands with only an intermittent, physically remote hydrologic connection to "waters of the United States" do not implicate the boundary-drawing problem of <u>Riverside Bayview</u>, and thus lack the necessary connection to covered waters that we described as a "significant nexus" in SWANCC.

<u>Id.</u> at 742.

Therefore in sum, under the plurality's approach, establishing that wetlands are covered by the CWA requires two findings. <u>Id.</u> First, the adjacent channel must itself contain a water of the United States (i.e., a relatively permanent body of water connected to traditional interstate navigable waters). <u>Id.</u> Second, the wetland must have a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins. <u>Id.</u>

Justice Kennedy concurred in the plurality's decision to remand the case. <u>Id.</u> at 759. He advocated, however, an entirely different approach for establishing whether wetlands come within the Corps' jurisdiction under the CWA:

[T]he Corps' jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense . . . wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

<u>Id.</u> at 779-80.

Justice Kennedy found the plurality's approach too limiting of the Corps' jurisdiction, identifying two limitations which the plurality proposed with which he disagreed. First, Justice Kennedy disagreed with the plurality's conclusion that the phrase "navigable waters" includes only

"relatively permanent, standing or flowing bodies of water." Id. at 768-69. He found that this limitation made little sense in view of Congress' concern with downstream water quality, and that jurisdiction should exist where intermittent water flow impacts downstream water quality, even if the flow of water is not relatively permanent. Id. at 769. Second, Justice Kennedy disagreed with the plurality's assertion that wetlands fall within the CWA only if they bear a "continuous surface connection" to bodies that are waters of the United States in their own right. Id.

The four dissenting justices would have upheld the broad interpretation of jurisdiction under the CWA and concluded that the wetlands at issue were "waters of the United States." Id. at 810. Justice Stevens observed that although the plurality and Justice Kennedy agreed that remand was appropriate, their opinions set forth different tests for the appropriate test to apply on remand. Id. He then concluded that, because all four dissenting justices would have upheld jurisdiction where either the plurality's test or Justice Kennedy's tests were satisfied, jurisdiction should in the future be upheld if *either* of those tests is satisfied. Id.

b.    The Governing Rule of Rapanos

After Rapanos was decided, the Corps of Engineers and the EPA issued memorandum providing guidance to EPA regions and Corps districts implementing Raponos ("Raponos Guidance"), to address the jurisdiction of the CWA over waters of the United States.[9] The Raponos Guidance explains that post-Rapanos, the agencies would evaluate whether either the plurality's relatively permanent waters standard or Justice Kennedy's significant nexus standard was satisfied,

_____

[9] The version of the Rapanos Guidance described here, is the updated version dated December 2, 2008. The Guidance is available on the Corps' website. See U.S. Envt'l Prot. Agency & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S Supreme Court's Decision in Rapanos v. United States & Carabell v. United States (Dec. 2, 2008), available at
http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/cwa_juris_2dec08.pdf

and that either test would satisfy a finding of waters of the United States.  Rapanos Guidance 3.  The Fourth Circuit has affirmed this view in an unpublished opinion.  See Deerfield Plantation Phase II-B Prop. Owners Ass'n v. United States Army Corps of Eng'rs, 501 F. App'x 268, 275 (4th Cir. 2012); see also Precon Dev. Corp. v. United States Army Corps of Eng'rs, 633 F.3d 278, 288 (4th Cir. 2011) (skirting the issue of whether both tests applied where the parties agreed to use the significant nexus standard, but also relying on the agencies' Rapanos Guidance).  With this background in law, the court turns now to the issues before it.

2.         Waters of the United States at Sutton

Plaintiff asserts three claims for violations of the CWA:  unauthorized surface discharges into Sutton Lake (Count I), unlawful entering of removed substances into state waters and navigable waters of the United States (Count II), and discharges through close hydrologic flow into Sutton Lake (Count III).  As to Count I and Count III, defendant contends that Sutton Lake is not a water of the United States protected by the CWA, and so there is no violation by discharging into the lake.[10]  As to Count II and Count III, defendant contends that groundwater is not a water of the United States, either.  The court addresses each contention in turn below.

a.         Sutton Lake

Plaintiffs allege that Sutton Lake was created by damming a navigable creek that flows into the Cape Fear River.  Sutton Lake was created with authorization for defendant to use it as a cooling water reservoir, and managed as a public fishery with boat ramp for public access. Defendant argues that because DENR treats Sutton Lake as a cooling pond through its permits, it is not a water of the United States.  However, this argument is not convincing, particularly where

_____

[10] Although defendant casts its argument regarding Sutton Lake as a failure to state a claim, the court examines it together with groundwater as a jurisdictional question pursuant to the CWA.

17

defendant has other public lakes used as cooling reservoirs for other power plants, which are classified and treated as waters of the United States. Compl. ¶ 45. Sutton Lake falls squarely within "conventionally identifiable waters," and may be "described in ordinary parlance" as a lake. Rapanos, 547 U.S. at 734, 739. Thus, plaintiffs have alleged sufficient facts to find Sutton Lake is a water of the United States subject to CWA jurisdiction.

        b.     Groundwater

The court turns next to the issue of regulating groundwater pursuant to the CWA. The CWA does not generally require NPDES permits for discharges to groundwater or wells. Courts have excluded from the CWA "isolated/tributary groundwater," such as confined wells. See, e.g., Exxon Corp v. Train, 554 F.2d 1310, 1329 (5th Cir. 1977). Some courts have held that an NPDES permit is not required for discharges to groundwater even if those discharges eventually migrate to surface waters. See, e.g., D.E. Rice v. Harken Exploration Co., 250 F.3d 264, 269 (5th Cir. 2001); Village of Oconomowoc Lake v. Dayton Hudson Corp., 24 F.3d 962, 965 (7th Cir. 1994).[11] These courts rely heavily on the CWA's statutory history and agency interpretation. For example, the Seventh Circuit concluded that "[n]either the [CWA] nor the EPA's definition [of waters of the United States] asserts authority over ground waters, just because they may be hydrologically connected with surface waters." Village of Oconomowoc Lake, 24 F.3d at 965.

By contrast, some courts have found that NPDES permits are required when discharges to groundwater result in the migration of pollutants to hydrologically connected surface waters. See,

---

[11] See also United States v. Johnson, 437 F.3d 157, 161 n.4 (1st Cir. 2006)(recognizing that "the CWA does not cover any type of ground water" where ground water is regulated by other statutes), vacated and remanded on other grounds by United States v. Johnson, 467 F.3d 56 (1st Cir. 2006); Cordiano v. Metacon Gun Glub, Inc., 575 F.3d 199, 223 n.6 (2nd Cir. 2009)(recognizing authority for the assertion that the CWA does not apply to ground water without reaching the issue).

e.g., Hernandez v. Esso Std. Oil Co., 599 F. Supp. 2d 175, 180 (D.P.R. 2009). These courts rely on the view that Congress intended to regulate the discharge of pollutants into surface waters of the United States, whether the pollutants reach the surface water directly or through groundwater. See id. See also 66 Fed. Reg. 2960, 3015 (Jan. 12, 2001) ("EPA is restating that the Agency interprets the Clean Water Act to apply to discharges of pollutants from a point source via ground water that has a direct hydrologic connection to surface water."). It appears that the Fourth Circuit has not addressed this jurisdictional issue.

The plurality holding in Rapanos repeatedly admonishes the lower courts and the Corps for attempting to expand the definition of navigable waters to encompass virtually all water, regardless of its actual navigability, location, or consistency of flow. Rapanos, 547 U.S. at 733-34. The Supreme Court also reiterates that, in Riverside Bayview, it held that the phrase "waters of the United States" "referred primarily to 'rivers, streams, and other hydrographic features more conventionally identifiable as waters' than the wetlands adjacent to such features." Id. at 734 (quoting Riverside Bayview, 474 U.S. at 131) (emphasis omitted). "Likewise, in both Riverside Bayview and SWANCC, [the Supreme Court] repeatedly described the 'navigable waters' covered by the [CWA] as 'open water' and 'open waters.'" Id. at 735 (citations omitted).

After close review of the competing analyses, this court finds the reasoning of the Court of Appeals for the Seventh Circuit persuasive, and holds that Congress did not intend for the CWA to extend federal regulatory authority over groundwater, regardless of whether that groundwater is eventually or somehow "hydrologically connected" to navigable surface waters. There is support for this holding in both the language and legislative history of the CWA and in the Supreme Court's ruling in Rapanos. In Rapanos, the Court does not endorse a broad interpretation of the term

19

navigable waters, and sets forth tests that will exclude some wetlands from the scope of the CWA. Thus, this court is satisfied that groundwater (which is even less fairly described as "open water" or a conventionally understood hydrographic or geographic "feature" than any wetland) does not fall within the meaning of the statute.[12] Therefore, plaintiffs' groundwater claims[13] are dismissed for lack of subject matter jurisdiction under the CWA.

  3.   Sutton NPDES Permit

  Defendant contends that the Sutton NPDES permit precludes liability here under the CWA, to which plaintiffs respond that defendant cannot be shielded from liability since it has violated the permit. Defendant further contends that plaintiff's complaint is nothing more than an impermissible collateral attack on the NPDES permit, which plaintiffs also contest.

  In 1972, Congress passed a comprehensive revision and recodification of the CWA, which established the NPDES permit program. 33 U.S.C. § 1342, CWA § 402. Dischargers to waters of the United States must obtain and comply with a permit under the NPDES program. Id. This program allows states to administer permits under the supervision of the EPA. 33 U.S.C. § 1342(b), CWA § 402(b).

  As a general rule, compliance with a permit constitutes compliance with the CWA. 33 U.S.C. § 1342(k), CWA § 402(k). This is referred to as the "permit shield," and operates with few exceptions. See 40 C.F.R. § 122.5 (listing exceptions to the permit shield). In this case, plaintiffs

---

[12] Of course, state laws may be more stringent than the floor of the CWA and regulate ground water as part of their permitting processes.

[13] The groundwater claims are all of Count III and parts of Count II that rely on discharges into groundwater as opposed to discharges into Sutton Lake. See Compl.¶¶ 78-92.

allege that defendant violated the Sutton NPDES permit's Removed Substances provision,[14] in addition to violating state and federal laws, by discharging into Sutton Lake and the groundwater.[15] Taking those factual allegations as true, plaintiffs have alleged discharges not authorized by the permit, and therefore it cannot shield defendant from liability.

Plaintiffs argue in the alternative that the Sutton NPDES permit violates the CWA by not treating Sutton Lake as a water of the United States. The court has found that there are sufficient factual allegations in the complaint to find Sutton Lake is a water of the United States. See supra Part C.1.a. Therefore, the permit may violate the CWA. Defendant contends that plaintiffs should have challenged the permit administratively instead of bringing a CWA case in federal court if they believe the permit did not treat Sutton Lake as a water of the United States, citing a string of cases under the Clean Air Act.

Courts which have examined this issue under the CWA do not require administrative appeals in citizen suits where the state agency fails to uphold fundamental requirements of the CWA. See, e.g., Dubois v. United States Dep't of Agric., 102 F.3d 1273, 1300 (1st Cir. 1996) ("[T]he CWA provides a federal floor, not a ceiling, on environmental protection. If a state seeks to approve a standard that is less stringent than the federal CWA's floor, or seeks to apply a standard in a way that is otherwise invalid under federal law, then federal agencies and federal courts are obligated to resolve the application of the federal CWA in any case that properly comes before

---

[14] As DENR similarly found at the Dan River Facility, a discharge from a coal ash pond into a water of the United States is a violation of the Removed Substances provision of an NPDES permit, which provides:
> Solids, sludges, filter backwash, or other pollutants removed in the course of treatment or control of wastewaters shall be utilized/disposed of in accordance with NCGS 143-215.1 and in a manner such as to prevent any pollutant from such materials from entering waters of the State or navigable waters of the United States except as permitted by the Commission.

(DE 16-2).

[15] The issue of groundwater regulation under the CWA is examined supra Part B.2.b.

them."). Thus, plaintiffs' complaint has alleged sufficient facts to state a claim under Rule 12(b)(6), except for groundwater claims which lack jurisdiction as discussed above.

        4.         Diligent Prosecution Bar

The court next examines defendant's argument that the court lacks jurisdiction because there is a diligent prosecution ongoing. The CWA prohibits citizens from bringing suit when either the federal or state government is "diligently prosecuting" a civil or criminal action regarding the same violations. 33 U.S.C. §§ 1365(b)(1)(B), 1319(g)(6). Courts have construed the diligent prosecution bar narrowly to prevent violators from escaping liability. See Washington Pub. Interest Research Group v. Pendleton Woolen Mills, 11 F.3d 883, 886 (9th Cir. 1993); Student Public Interest Research Group of New Jersey v. Fritzsche, Dodge & Olcott, 759 F.2d 1131 (3d Cir. 1985). Agency enforcement action must have been instituted before the citizen suit is brought. Long Island Soundkeeper Fund, Inc. v. New York City Dep't of Envtl. Protection, 27 F. Supp. 2d 380 (E.D.N.Y. 1998); Sierra Club v. Hundai America, Inc., 23 F. Supp. 2d 1177 (D. Or. 1997); Mass Pub Int. Research v. ICI Americas Inc., 777 F. Supp. 1032, 1036 (D. Mass. 1991). Furthermore, a state prosecution does not bar a citizen suit if the state law is not comparable to the federal CWA. See 33 U.S.C. 1919(g)(6)(A)(ii); North Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., Inc., 200 F. Supp. 2d 551, 557 (E.D.N.C. 2001) (finding CWA citizen suit not barred where state had brought enforcement action under state law). A pending state administrative action or permit also does not bar a citizen suit. See, e.g., Black Warrior Riverkeeper, Inc. v. Birmingham Airport Auth., 548 F.3d 986, 992 (11th Cir. 2008) (no preemption where citizens filed complaint at end of notice period and where state submitted draft unilateral consent order to defendants prior to notice period ending).

In this case, not only does the complaint in state court address different claims than those before this court, but the state laws being enforced concerning compliance boundaries for groundwater contamination are different than the CWA laws upon which plaintiffs rely here. The court would also be remiss to bar suit based upon pending state administrative actions where they do not bar citizen suits, and where, in this case, there have been allegations of possible improper influence. Dismissal for lack of jurisdiction on the basis of diligent prosecution is not warranted.

## CONCLUSION

Based upon the foregoing, the court GRANTS IN PART defendant's motion where it moves to dismiss plaintiff's groundwater-related claims for lack of jurisdiction, and DENIES IN REMAINING PART the motion to dismiss (DE 15). Plaintiffs' motions seeking permission to inform the court are DISMISSED AS MOOT (DE 28, 32).

In accordance with the court's November 15, 2013, order, the stay on discovery is hereby lifted. With reference to the court's initial order regarding planning and scheduling, entered November 6, 2013, the parties shall conduct the Rule 26(f) conference within **twenty-one (21) days** from entry of this order and adhere to other requirements therein set out. If either side determines a conference by telephone with the court in advance of entry of the case management order is appropriate, that information shall be included in the parties' joint report.

SO ORDERED, this the 9th day of June, 2014.

_____
LOUISE W. FLANAGAN
United States District Court Judge